UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES OF AMERICA** ) | |
| ) | |
| ) | |
| **v.** ) | Case No. 24-cr-00121-CRC |
| ) | |
| **STEVEN BAKER** ) | |
| ) | |
| ) | |
| **Defendant** ) | |
| ) | |

## DEFENDANT BAKER'S REPLY TO GOVERNMENT'S OPPOSITION TO MOTION TO DISMISS COUNTS ONE, TWO, THREE, AND FOUR OF THE INFORMATION

William L. Shipley, Jr., Esq.
PO BOX 745
Kailua, Hawaii 96734
Tel: (808) 228-1341
Email: 808Shipleylaw@gmail.com

*Attorney for Defendant*

Defendant Steven Baker is a journalist.  He is now employed by Blaze Media, but on January 6, 2021, he was a freelance journalist who also did his own reporting on social media.  He has had a Senate-issued Press Credential since 2023.

That is not disputed by the Government.

Mr. Baker entered the Capitol through the Senate Wing doors at approximately 2:19 pm.  For a lengthy period of time prior to that, and at all times after entering, Mr. Baker was recording the events with a video camera and microphone from the time he was on the lower West Plaza level up until he went into the Capitol, then throughout his time in the Capitol and continuing to when he exited the Capitol at approximately 2:56 pm.

Mr. Baker has licensed portions of his video to various media outlets such as the New York Times and HBO – just as many other freelance journalists who were on the grounds and inside the Capitol did in the days following January 6.

Mr. Baker's video from January 6 has been assembled into one continuous piece, showing every step Mr. Baker during his time on the grounds and inside the building.  That video is filed along with this Reply as Exhibit 1.

The Government opposes this motion, including the request of discovery, on the basis that Mr. Baker has only provided a list of individuals he believes were on the grounds of the Capitol and/or inside the Capitol building itself, and argues that is an insufficient basis upon which to find a sufficient showing of disparate treatment warranting dismissal, nor does it justify discovery being

ordered by this Court on this issue so that a more fact-intensive inquiry can be done.

Contrast Mr. Baker with freelance journalist Luke Mogelson.  Mr. Mogelson entered at the location of the Senate Wing door -- through one of the windows broken next to the doors – at 2:29 pm.  He did so in roughly the same time frame as Mr. Baker, several minutes after other protesters have broken out the windows on both sides of the Senate Wing Doors, and forced the doors open from the inside.  Mr. Mogelson's travels inside the Capitol are captured ina video produced by The New Yorker Magazine.  That video is failed as Exhibit 2 to this Reply.

Mr. Mogelson walked throughout the Capitol just as Mr. Baker did.  Mr. Mogelson and a cameraman with him (Balazs Gardi) recorded the events he was observing as he moved through the building.  Mr. Mogelson used his recorded observations to write a multi-thousand word essay which he sold to The New Yorker magazine, which ran his story nine days later under the title "[Among the Insurrectionists](#)" on January 15, 2021.   The following are excepts from Mr. Mogelson's published confession:

> A jet of pepper spray incapacitated me for about twenty minutes. When I regained my vision, the mob was streaming freely through all three doors. I followed an overweight man in a Roman-era costume—sandals, cape, armguards, dagger—away from the bleachers and onto an open terrace on the Capitol's main level. People clambered through a shattered window.
>
> ….
>
> I followed a group that broke off to advance on five policemen guarding a side corridor. "Stand down," a man in a maga hat commanded. "You're outnumbered. There's a fucking million of us out there, and we are listening to Trump—your boss."

> "We can take you out," a man beside him warned.
>
> The officers backpedaled the length of the corridor, until we arrived at a marble staircase. Then they moved aside. "We love you guys—take it easy!" a rioter yelled as he bounded up the steps, which led to the Capitol's central rotunda.
>
> ….
>
> When Babbitt was shot, I was on the opposite side of the Capitol, where people were growing frustrated by the empty halls and offices.
>
> "Where the fuck are they?"
>
> "Where the fuck is Nancy?"
>
> ….
>
> After Chansley, the Q Shaman, left his note on the dais, a new group entered the Senate chamber. Milling around was a man in a black-and-yellow plaid shirt, with a bandanna over his face. Ahead of January 6th, Tarrio, the Proud Boys chairman, had released a statement announcing that his men would "turn out in record numbers" for the event—but would be "incognito." The man in the plaid shirt was the first Proud Boy I had seen openly wearing the organization's signature colors. At several points, however, I heard grunts of "Uhuru!," a Proud Boys battle cry, and a group attacking a police line outside the Capitol had sung "Proud of Your Boy"—from the Broadway version of "Aladdin"—for which the organization is sardonically named.

There is no question that Mr. Mogelson was on the grounds and inside the Capitol as is made clear by his first-person references with regard to his location and what he observed. He's captured on CCTV and Officer Body Worn Cameras. The New Yorker has published a lengthy video showing Mogelson's locations at a various times during the day on January 6.

The content of his First Amendment protected reporting expresses a hostility towards those who came to the Capitol on January 6 to protest and riot.

Mr. Mogelson has not been prosecuted.

Mr. Mogelson is just exemplar -- one of dozens of journalists, freelancers and journalists employed by corporate media – who went onto the Capitol grounds and inside the Capitol.  If they were not on the pre-approved list of journalists authorized to enter the Capitol to cover the Joint Session of Congress, then differential treatment they have received as compared to Mr. Baker requires exploration by the defense.

Defendant Baker has given this Court and the Government approximately 60 names of journalists, along with the news organization they worked for where applicable, who went inside the Capitol or were on the grounds on January 6, 2021.  No one on the list has been charged in the fashion Mr. Baker has been charged even though their <u>conduct</u> is identical.

Any individual among those 60 who was not on the authorized list approved by the U.S. Capitol Police to be on the Capitol grounds on January 6 engaged in the same alleged conduct as Mr. Baker.  Mr. Baker cannot know who was on the authorized list without that list being provided by the Government in discovery, as well as any justification being proffered by the Government as to why these other journalists have never faced charges in the 44 months since January 6, but Mr. Baker now is.

Further, the Government continues to reference comments made by Mr. Baker on January 6 – one comment recorded several hundred yards away before he even reached the Capitol grounds and could see what was happening, as well as his comment inside the Capitol when being confronted with firearms drawn by law enforcement officers inside.

The Government seems to not be aware of the fact inside the Capitol none of the law enforcement officials had drawn the weapons until AFTER Lt. Michael Byrd shot and killed protester Ashlii Babbit – and then put out a radio call that SHOTS HAD BEEN FIRED AT HIM.  That resulted in the initial communication to all officers inside the Capitol that there was an "active shooter" situation.  ALL Officer inside the Capitol drew their firearms and began searching for the armed protester(s) who had supposedly fired shots at Lt. Byrd – according to Lt. Byrd.

But, as is now well established, there were no other shots fired beyond the single shot fired by Lt. Byrd at Ashlii Babbit.  There never was an "active shooter" among the protesters inside the Capitol.

So, the context for Mr. Baker's comment, made immediately after the police officers suddenly drew their firearms for the first time – with the Government raising it over and over as if it is justification for his disparate treatment – was that the Officers inside the Capitol went from not having their weapons drawn on the crowd to all at one time having their weapons drawn and pointing them at the crowd.  Mr. Baker's comment to the officers was an earnest question – were the Capitol Police preparing to shoot people who were inside the Capitol if they did not leave?  The answer to his question – if given one -- was going to pay a significant role in what Mr. Baker chose to do following the answer.

His comments are protected free speech.  The fact that the Government seems preoccupied with continually introducing Mr. Baker's words into its arguments in opposition to motions made by Mr. Baker gives rise to the

inference that it is political animus and bias, with the Government's subjective misinterpretation of his comment, that has led DOJ to selectively prosecute only Mr. Baker while electing to not prosecute other journalists who have not reported on issues in the months and years that followed January 6 that outraged the Department of Justice and U.S. Capitol Police.  This includes reporting by Mr. Baker about whether DOJ put on perjured testimony by a U.S. Capitol Police in *United States v. Rhodes* with regard to the location of Officer David Lazurus inside a tunnel – as captured by video – at a time of the day that Officer Lazurus testified under oath he was watching U.S.C.P Officer Harry Dunn engaged in standoff with members of the Oath Keepers inside the Capitol.

      Mr. Baker has reported on the controversy over unanswered questions surrounding the discovery of an apparent pipe bomb at DNC headquarters a short distance from the Capitol after 12:00 noon on January 6, while Vice President Harris was inside that building, and the curious lack of urgency displayed by the police – by anyone – to deal with a "bomb" in close proximity to the Vice President-elect.

      He has reported on the likely "sanitation" of the personnel files of various command officials in the U.S. Capitol Police chain of command that removed disciplinary actions that should have led those officials to be terminated long before January 6 under U.S. Capitol Police policies.

      The U.S. Capitol Police have a list in its electronic records of every journalist who was cleared in advance to be inside the Capitol to cover the Joint Session of Congress set to take place on January 6, 2021.

The reason Mr. Baker's motion should succeed where other similar motions have failed is that Mr. Baker is not comparing the circumstances of his prosecution to decisions by DOJ to not prosecute others in similar situations not involving the events at the Capitol on January 6, 2021.  Judges of this Court have dismissed motions similar to this on the grounds that the events of January 6 at the United States Capitol were so distinct and unique from any other politically based protest that there is no basis to compare the exercise of prosecutorial discretion to pursue charges in connection with January 6 but not pursue charges in connection with similar conduct in other locations on other days.

Mr. Baker's motion does not suffer from that defect and cannot be denied on that basis.

The individuals receiving differential treatment, with Mr. Baker having been singled out to be selectively prosecuted, were in the same class of individuals as Mr. Baker – journalists working on January 6 who were at the Capitol – but not on the list of journalists approved in advance to be there by the U.S. Capitol Police.

Since January 6 Mr. Baker's reporting activities – with a distinct political point of view – have been critical of the Department of Justice and the U.S. Capitol Police on questions involving their handling of the events of that day as well as the prosecutorial efforts that have taken place in the aftermath.  Nearly thirty-eight months after the fact, Mr. Baker becomes the one journalist the Government opts to cull from the pack and charge with multiple crimes in connection with his reporting.

Mr. Baker has provided a list of names of other journalists whose reporting establishes their presence at and inside the Capitol on January 6. Mr. Baker cannot know without discovery of the authorized list of authorized media members created and maintained by the U.S. Capitol Police who among those journalists named – besides Mr. Mogelson – were not authorized to be inside the Capitol.

The motion is styled in the alternative – a motion to dismiss, or if appropriate at this juncture, a motion to discovery so that the intensive "fact driven" inquiry referenced in the Government's Opposition can take place.

The Government may not yet be in the position of having to defend its exercise of prosecutorial discretion to rebut a showing of selective prosecution based on political views that would be outrageous government misconduct, but the more journalists who fall into the same category of Mr. Mogelson and Mr. Gardi – inside the Capitol without permission in order to report on the story – the more the obligation is going to shift to the government to provide a legitimate basis for its decision-making with respect to Mr. Baker in this case.

Dated: September 20, 2024	Respectfully Submitted,

William L. Shipley, Jr., Esq.
PO BOX 745
Kailua, Hawaii 96734
Tel: (808) 228-1341
Email: 808Shipleylaw@gmail.com

*Attorney for Defendant*